Charles B. Parke (40427-086)
FCI TERMINAL ISLAND
FEDERAL CORRECTIONAL INSTITUTION
P.O. BOX 3007
SAN PEDRO, CA 90733

JUN 01 2021

Clerk, U.S. Courts
District of Montana
Missoula Division

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BUTTE DIVISION

| UNITED STATES OF AMERICA, Plaintiff, | Case: CR 08-24-BU-BMM |
|---|---|
| v. | REPLY IN SUPPORT OF DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE |
| CHARLES B. PARKE, DEFENDANT. | Judge: HON. BRIAN MORRIS (CHIEF DISTRICT JUDGE) |

I, Charles B. Parke, the defendant in the above-captioned matter, am a non-violent drug offender incarcerated in federal prison with a very significant risk of COVID-19 complications and death if I become infected. I am housed at FCI Terminal Island in San Pedro, California, one of the BOP's worst

①

Managed prisons during the current pandemic. <u>Two newly discovered BoP reports</u> in my Terminal Island medical records show doctors here have <u>twice confirmed my CDC identified COVID risk factors</u>, and <u>twice recommended my release to home confinement</u>. (See ECF 140-2, pp. 42-49). The government makes no mention of these reports or their findings.

As initially referenced in my pending motion and discussed here in Reply to the government's opposition; combined, my health risk, COVID-19 realities within the BoP and Terminal Island specifically; my unjust suffering of abuse and violent assault, my post-conviction conduct and rehabilitation, my "low" risk of dangerousness and recidivism as determined by the BoP's PATTERN assessment, and two relevant legal developments supported by recent Ninth Circuit decisions; all support compassionate release

②

as I've requested in my pending motion.

The government is opposed to my request (_see_ ECF No. 139, filed 03/17/21). However, the bulk of the government's opposition is on the wrong side of the Ninth Circuit Court of Appeals' recent decision in _United States v. Aruda_, 2021 US App. LEXIS 10119 (9TH Cir. April 8, 2021) (rejecting the position that U.S.S.G. 1B1.13 is binding on a district court's consideration of an 18 U.S.C. §3582(c)(1)(A) motion filed by a defendant.) Additionally, either through inattention, oversight or a lack of candor, the government grossly minimizes my medical condition and COVID-19 related risk; presents generic BOP COVID policy aims without acknowledging specific DOJ OIG and federal court findings about COVID risk at Terminal ③

Island; omits any reference to the stream of COVID related deaths at Terminal Island — including deaths of those listed by the BOP as having "recoverd" from COVID-19 and fails to inform the court of recent DOJ acknowledgments that despite its plans COVID-19 remains a substantial risk that is not managable by inmates through self-care. Finally, the government offers a conclosory statement that "release from prison now would undermine the factors considered at his [my]... sentencing such as just punishment, need for deterence, and need to promote a respect for the law." ECF 139, p. 17. But this bare conclusion is contradicted by my substantial post-conviction improvement (illustrated by official BOP documents ignored in the government's filing), the Ninth

④

Circuit's now routine condemnation of the manner used in my case to inappropriately apply the § 4B1.1 "career offender" sentencing enhancement and the documented, unjust physical abuse and neglect I've suffered while in BOP custody.

When placed and considered in the current COVID context, my situation fits well within the main stream of Compassionate Release decisions in this circuit and across the country, and justifies my requested reduction in sentence. In order to Reply with more detail, to the government's March 17 filing, I submit the following:

## 1. COURT AUTHORITY

The government agrees that "exhaustion" ⑤

pursuant to 18 U.S.C. §3582(c)(i)(A) is _not_ an
issue here. <u>See</u> ECF 139, p. 12 ("The United States
acknowledges that the defendant did exhaust his administrative
remedies prior to filing his motion for compassionate
release.")

## 2. Extraordinary And Compelling Reasons.

The court has authority to reduce my sentence
after re-evaluating §3553(a) factors in light of my
current circumstances, "if it finds that — ... extraordinary
and compelling reasons warrant such a reduction[.]" §3582
(c)(i)(A)(i). The bulk of the government's opposition
to my motion rests on its _mistaken_ position that the
court's ability to find "extraordinary and compelling"
reasons is limited by the policy statement at

⑥

U.S.S.G. §1B1.13. This policy statement narrowly defines what circumstances can satisfy the statutory requirements here, and requires the court to engage in a seperate "danger to the community" analysis provided in 18 U.S.C. §3142(g). USSG §1B1.13. The government's whole argument in opposition to my motion is premised on the applicability of §1B1.13. See e.g. ECF 139, pp. 10-12, 14-15.

However, at the time of the government's filing the majority of district courts across the country, and a growing body of appellate courts had ruled that the First Step Act of 2018 (Pub. L. 115-391 §603(b), 132 Stat. 5194, 5239 (Dec. 21, 2018)) rendered USSG §1B1.13 obsolete since it does not apply to motions

⑦

filed by defendants. _See e.g. United States v. Brooker_, 2020 U.S. App. LEXIS 30605 (2ⁿᵈ Cir. Sept. 25, 2020) ("[W]e conclude that after the First Step Act... Guideline 1B1.13 is not 'applicable' to compassionate release motions brought by defendants...[and] cannot constrain district court's discretion to consider whether any reasons are extraordinary and compelling.") _See also United States v. McCoy_, 2020 U.S. App. LEXIS 37661 (4ᵗʰ Cir. Dec. 2, 2020) (holding that district courts have wide discretion conferred by Congress to determine what constitutes "extraordinary and compelling" reasons for compassionate release); _id._, ("We see no error in their reliance on the length of the defendants' sentences, and the dramatic degree to which they exceed what Congress now deems appropriate, in finding 'extraordinary and compelling

⑧

reasons' for potential sentence reductions[]") There are too many similar decisions to list here. The point, however, is that the government's March 17 opposition fails to even acknowledge that the applicability of 1B1.13 was even an open question despite this large and substantial body of expanding federal law determining how district courts determine compassionate release motions. Then, a few weeks after the government's filing the Ninth Circuit decided the <u>Aruda</u> case (on April 8, 2021) expressly joining the chorus of other federal courts concluding the "Sentencing Commission's statements in USSG 1B1.13 may inform a district court's discretion... but they are not binding." Given the government's fundamental reliance on 1B1.13 in its opposition here, candor could have prompted notice of this authority to the court and to me —

⑨

but it apparently did not.

Nevertheless, it is now beyond dispute that in the Ninth Circuit (as well as the 2nd, 4th, 5th, 6th, 7th and 10th) USSG 1B1.13 is not applicable as a binding limit on the district court's determination of what constitutes extraordinary and compelling reasons for compassionate release. Even in the Eleventh Circuit (which has ruled 1B1.13 is binding – <u>see</u> <u>United States v. Bryant</u>, 2021 US App LEXIS 13663 (11ᵀᴴ Cir. May 7, 2021)) – the catch-all provision in Application Note 1(D) to 1B1.13 allows a court to exercise its discretion broadly to grant compassionate release due to medical vulnerability and COVID-19 risk.

Here, to be clear, the extraordinary and compelling reasons the government acknowledges I've raised by my

⑩

motion include my age, my heart conditions (including transplant and hypertension), immune deficiency, prediabetic syndrome, obesity and prior physical injuries — all as related to COVID-19 risk. See ECF 139, p. 5. In addition, the government responded to my motion by also obtaining and filing over 250 pages of medical and disciplinary records from my BOP inmate file. As addressed below, the government's review of these records appears to have been merely cursory, and it factually misstates several conclusions about my conditions and risk. Nevertheless the government also directly addresses the following additional conditions: "gastro-esophageal reflux disease and gout", id., p. 5, and raises the issue of medications I recieve regularly. While I disagree with the government's purpose in raising these additional issues, I

(11)

welcome the invited inquiry by the court on these topics and include below, references to judicially noticable CDC guidance demonstrating how these additional conditions, issues and fact only show the severe and increased risk I face related to a possible COVID-19 infection.

Also, while the government ignores the BOP security designation and PATTERN Risk score charts I've provided, it also raises, as grounds for the court's evaluation, my post-conviction conduct while in prison, see id., pp. 15-16, the court's prior reliance on the "career offender" § 4B1.1, see id., p. 15, and topics of "dangerousness" "deterence" and "respect for the law." Id., pp. 16-17. I accept the government's addition of these additional grounds for the court's consideration and as detailed below, will reference Ninth Circuit precedent to

⑫

demonstrate how these new topics raised by the government support a finding of "extraordinary and compelling" reasons to justify granting my motion for compassionate release.

In sum, since USSG §1B1.13 is not binding on the court's exercise of discretion, and since the court now has my motion (with attachments) and the government's response (with attachments) it is apparent that the following issues are now before the court for its consideration of my claim that extraordinary and compelling reasons exist to grant compassionate release:

- My medical conditions and COVID risk due to my serious heart condition (multiple valve transplants and hypertension), my obesity (BMI over 30) and morbid obesity (BMI over 40), my prediabetes (metabolic syndrome), my age and other related health history;

- The COVID-19 Pandemic inside the BOP and specifically at Terminal Island where I'm confined;

(13)

- My post-conviction rehabilitation and conduct, as well as related developments while I've been in BOP custody, including my suffering from brutal physical assault and neglect, the BOP's formal and undisputed assessment of me as not being "dangerous" upon release and the BOP's also undisputed assessment of me being a "low" risk of recidivism after considering my age, criminal history, prison conduct, prison programming, drug therapy and education, and work rehabilitation.

- Other facts and legal developments since my sentencing, that should be considered as part of the court's re-newed evaluation of § 3553 (a) factors; including recent action by the Montana Supreme Court in my case and the likelihood that my sentence, if imposed today, under current Ninth Circuit law related to the §4B1.1 "Career offender" enhancement, would have been at or close to the mandatory minimum sentence of 10 years (120 months) rather than the 262 months I recieved.

After considering these grounds, the court should find (14)

extraordinary and compelling reasons and grant compassionate release.

### 3. My MEDICAL CONDITION

In several areas the government misstates facts regarding my Medical records and condition, and in others it significantly disregards the severity and related COVID-19 risks I face as an inmate at Terminal Island.

The government conceeds that I've been "diagnosed with hypertension", ECF 139, p. 5, but argues "hypertension is only listed in the second category of [CDC] risk factors... which applies to conditions that might create a higher risk of severe illness." ECF 139, p. 13. As such, the government concludes "since the defendant's medical condition(s) only fall within the second category... he cannot meet the "extraordinary and compelling" standard for release." Id., p. 14. But, the government's treatment of this issue is emblematic of its general

(15)

disregard of the facts and the law. In fact, the government's approach is plainly not earnest.

First, to keep my Covid risk factors in the "second" CDC category of only "potential" risk, the government skips past my obesity as a risk factor. "Obesity", according to the CDC, as measured by body mass index (BMI) score, is a top primary condition and "people of any age" with a BMI greater than 30 points "are at increased risk for severe illness from Covid-19." Exhibit A (CDC-Coronavirus Disease). The government knows I alleged this first category risk factor, <u>see</u> ECF 139, p. 13, but says "there is not any indication in the medical records that he has a body mass index above 30 kg." <u>Id</u>. Yet, the government obtained and submitted 250 pages of my records. These records plainly show my BMI is

(16)

is greater than 30.  See e.g. ECF 140-1, p. 11 ("Weight" is
"225" pounds or "102.1" kilograms); p. 12 ("Appears Obese");
p. 104 ("Weight" is "225" pounds or "102.1" kilograms); p. 180
("Body Mass Index 31.0 - 31.9"); p. 180 ("Body Mass Index 32.0 -
32.9" and "height of 66"); p. 181 ("Body Mass Index 33.0 - 33.9"
and "Body Mass Index 36.0 - 36.9" with "height" of 65" and
"Body Mass Index 37.0 - 37.9").  See also ECF 140-2, pp. 80-
82 (showing 19 data entry events recording BMI between 31
and 37.9).  See also ECF 140-2, p. 48 ("Inmate Parke's
specific Covid-19 risk factors are obesity, hypertension and
heart valve transplant.") For the court's convenience I've
included a copy of each of these pages as Exhibit B.
Contrary to the government's claim of there not
being "any indication in the medical records" the court

(17)

can see more than 40 seperate BMI assessments by BOP Health Services over the last twelve years showing my BMI score has always ranged between 30 and 39. This is a CDC category 1 risk for COVID complications and death. See Exhibit A. The fact that the government cavelierly and non-chalontly argues the opposite in the face of these records is an indication of the lack of candor, diligence and earnestness behind the government's opposition. Unfortunately, during the COVID pandemic my situation has worsened, and has risen to a BMI over 40. See Exhibit C. A BMI score is simple to calculate, in English Units the formula is $BMI = 703 \times weight (lbs) / height (in)^2$. See Exhibit D. With my height of 66 inches (see Exhibit E "BOP ID") and my

(18)

Weight of 251 lb (see Exhibit C) my current BMI score is 40.5. The CDC updated the category 1 COVID risk factors to include both "obesity" (meaning BMI $\geq$ 30) and "severe obesity" (meaning BMI $\geq$ 40). Exhibit E. Thus, the government's position that I suffer from no CDC category 1 COVID risk factors is false.

Second, in addition to disregarding my **obesity** the government attempts to disregard my serious heart condition in a footnote. See ECF 139, p. 13 n. 2. The government speculates that my multiple heart valve transplants do "not appear to qualify as a solid organ transplant" under CDC category 1 risks. Significantly, the government offers no explanation and cites to no CDC guidance in making this claim. But, the CDC's original category 1 list

(19)

included "people of any age" who suffer from "serious heart conditions, such as heart failure, coronary artery disease, or cardiomyopathies" as being at "increased risk of severe illness from COVID-19[.]" Exhibit A. Its unclear what logical reason the government relied on to argue that "two prior open-heart surgeries" and multiple "valve replacement[s]" are not serious heart conditions under CDC Category 1. See ECF 139, p. 13. Further, the CDC examples for serious heart conditions expressly includes "coronary artery disease" and my medical records include, for example, confirmation of "coronary atherosclerosis" and multiple heart valve transplants, as well as "heart failure[.]" ECF 140-1, p. 175.

Dr. Jennifer Anne Cooper-Lewis noted on May 3,

⑳

2019 that I have a history "significant for cardiac valve disease [.]" ECF 140-1, p. 244. But, the court doesn't have to rely on the government's curious logic, or the matching up of certain words or phrases from my medical records and the CDC publications. **The best evidence** available is explained by **the BOP** itself (which is the same Executive Branch of the United States represented by Plaintiff). Significantly, after **obtaining** my Medical records the government — either through lack of candor, lack of reasonable investigation, or lack of earnestness — has buried the direct medical records on all this COVID risk analysis.

Specifically, in a **four-page** BOP Health Services **Report** dated October 6, 2020 the government

(21)

expressly states "Inmate Parke's specific Covid-19 risk factors are obesity, hypertension and heart valve transplant." ECF 140-2, pp. 42-45. The report goes on to explain that BOP "Health Services Department has reviewed all information available and believe[s] the conditions under which the inmate would be confined upon release to home confinement would present a lower risk of contracting Covid-19." Id., p. 44. The BOP issued a second report on November 23, 2020 with the same Covid risk factors and recommendation for release to home confinement with the addition of CDC guidance-based inmate education and the following conclusion: "Home Confinement provides the opportunity for...optimal infection control measures, which may mitigate existing risks based on rates of transmission

22

in the local area, and is likely not to increase the inmate's risk of contracting COVID-19." Id., p. 48. I'm providing copies of these two reports from the government's prior submission as Exhibit F.

In sum, the governments effort to concede hypertension, but ignore morbid obesity (and obesity) and my serious heart conditions is both inaccurate—based on my medical records and CDC guidance—but also contradicts the medical conclusion of BOP Health Service professionals who published two reports confirming — explicitly — my risk of Category 1 and 2 CDC-described COVID complications and possible death. The government's position, and its failure to address these reports, further belies reliance on its opposition generally. In any event, I suffer from

(23)

a combined constellation of medical conditions that put

me at the highest risk category outlined by the CDC.

In addition to the three conditions discussed so far,

my pre-diabetes (aka Metabolic syndrome, <u>see</u> ECF

140-1, pp 213, 241; ECF 140-2, p. 48) and reliance

on PPI medications for Gastro-esophageal disease

(<u>see</u> ECF 140-1, pp. 197, 250; ECF 140-2, pp. 89, 132)

also present added COVID-19 risk of death. <u>See</u>

Exhibit G (PPI and COVID). Thus, the government's

reliance on two cases denying compassionate release

solely due to hypertension alone as a risk factor, is

inapposite and should be unpersuasive. ECF 139,

p. 14. More persuasive examples include <u>United States</u>

<u>v. Ferizi</u> (No. 1:16-cr-42 LmB)(ED Va. Dec. 3, 2020)

24

where the defendant was initially sentenced to 240 months but that sentence was reduced to time served after 60 months served. The defendant in _Ferizi_ had a chronic cough, asthma and suffered from obesity (his BMI fluctuated from 30 and 31 during incarceration). Also in _United States v. Bozon-Papph_, Case No. 1:95-cr-00084-JAL (S.D. Florida) (ECF 483, April 1, 2021) the defendant who had a history of obesity and smoking was granted compassionate release. Similarly, even before the Ninth Circuit's decision in _Aruda_ which removed USSG §1B1.13 limitations on a district court's discretion to determine compassionate release, _this_ court's decision in _United States v. Houston_, 2020 U.S. Dist. LEXIS 144948 (D. Montana, Aug. 12, 2020) is persuasive in that it found Houston's "serious medical condition" extrordinary and

(25)

compelling, which consisted of "Asthma, COPD,... Morbid obesity, obstructive sleep apnea, sarcoidosis, acute bronchitis, acute upper respiratory infection, and congestive heart failure." The court found these "conditions significantly compromise her ability to ~~live~~ survive contracting COVID-19." Id. My medical history **also includes** "acute respiratory infection", ECF 140-6, p. 175, and "heart failure ... secondary to aortic valve injury"; id.

For these reasons the court should conclude that my serious medical conditions, as well as my CDC listed category 1 and category 2 based COVID-19 risks compromise my ability to survive contracting COVID-19, that I'd be safer in home confinement / supervised release, and that these constitute extraordinary and

26

compelling reasons for release.

## 4. COVID INSIDE THE BOP AND AT TERMINAL ISLAND.

While much of the public appears to be moving past the heightened concerns for COVID-19 infections in light of successful vaccine roll-out and theraputic advances in treating COVID, the BOP admitted in April 2021 that the pandemic is still an enormous problem inside federal prisons. In fact, COVID deaths continue, medical treatment is still inadequate and FCI Terminal Island remains under a federal court injunction for its violation of inmate rights protected by the Eighth Amendmendment, due to its COVID-19 related failures. See Wilson v. Ponce, Case No. 2:20-cv-04451- ㉗ MWF-MRW, (USDC, Central Dist., California)(ECF 91). [58,]

Further, in January 2021 the Department of Justice's Office of the Inspector General issued a report detailing Terminal Island's failures to keep social distancing, quarantine and testing protocols advised by CDC and BOP, resulting in more than 70% of the inmate population becoming COVID-19 positive and the death of at least 10 inmates due to COVID complications. See Winton, Richard, "Mistakes worsened deadly COVID-19 outbreak at L.A. federal prison, investigation finds." Los Angeles Times, Jan. 13, 2021 (Attached as **Exhibit H**). These specific indictments of BOP conduct and **Terminal Island** conditions undermine the government's boiler-plate and generic re-assurances of BOP's public relations and press release materials. See ECF 139, pp. 6-9.

㉘

Even more inadequacies in the government's response

and opposition to my motion are revealed in *the one* specific reference made in the government's opposition to conditions at Terminal Island. On page 6 of its response, the government cites "the BOP website" showing "zero inmates and five staff" testing positive for COVID-19 as of March 12, 2021. This isolated statistical claim has many fatal problems. First, the government implicitly admits that despite the BOP's vaccination efforts and "130 staff members at FCI Terminal Island" having been "fully inoculated to date" **still at least** five staff are infected showing the continued risk of outside-to-inside transmission.

Second, as far as the argument that 700 inmates at Terminal Island who were previously infected but are now "recovered" according to the BOP — specific data now shows

(29)

that COVID-19 **re-infection** in prisons is a real risk. For example on August 24, 2020, Marie Neba died from the virus and her underlying medical conditions at the age of 56 (three years older than me), a few weeks after the BOP had declared her "recovered" from COVID-19, which, moreover, she had contracted while housed in one of the BOP's medical centers, considered among the safest of BOP facilities from the virus. The BOP's unsympathetic press release is attached as **Exhibit I.**   Also, **Exhibit J** consists of similar BOP press releases for ten of my fellow inmates <u>here</u> at Terminal Island who have died after BOP/Terminal Island staff failed to protect them from (and who were each unable to provide for self-care against) the virus. These include inmate Adrian Solarzano who died from COVID more than

(30)

a month and a half **after** the BOP simply "declared" him

recovered. He was 54 years old (one year older than me).

I've served time with these inmates: McDonald, Solarzano,

Lino, Cutting, Robles-Holguin, Averback, Cino, Begay, Fleming,

and Ghilarducci. The government's response doesn't even

acknowledge they died, <u>here</u> - from COVID - and <u>**the problem**</u>

<u>**continues.**</u> I have not been able to obtain a press release

yet, but just this month (<u>**10 days ago**</u>) another inmate

here at Terminal Island, declared "recovered" last year by

the BOP — died from the virus, his name is Dan Spears

and he was under 60 yrs. old. These are not merely isolated

examples. In April 2021 the BOP announced that inmate

Leonard Williams died of COVID on March 22, 2021 after

showing no symptoms and being declared "recovered" a month

(31)

earlier. The BOP also announced the death of inmate Jaime Benavides. He was declared "recovered" in December 2020, but died of COVID on March 25, 2021. All these are judicially noticable public records on BOP.gov. But, a Utah federal judge recently summed up BOP and prosecutor reassurances of safety and managable COVID risk in federal prisons when he declared that such assurances amount to "nothing more than impermissible ipse dixit" because in the case before him the inmate was "currently unvaccinated, exposed to many other inmates who are similarly unvaccinated, being gaurded by substantial percentage of staff who... have also not been vaccinated, and because it is likely that he is capable of being re-infected" and therefore "at risk of being infected with COVID-19." <u>United States v. Groat</u>, Case No.

(32)

2:17-cr-104, 2021 U.S. Dist. LEXIS 65194 (D. Utah April 2, 2021). Similarly, medical professionals like Dr. Homer Venters (an epidemiologist investigating COVID-19 in BoP facilities) has/have warned, "When you kind of wave a wand over people and say they're recovered, my experience going into jails and prisons is many of them are not actually recovered." KXAS-TV, Seagoville Federal Prison COVID-Cases Fall Drastically, Expert Warns Against New Data as Family Mourns Loss (Aug. 14, 2020). I could list seemingly endless examples showing that despite BoP assurances, "recovered" and "not yet infected" inmates remain at serious risk of death from COVID (including e.g. inmate Ricky Miller (FCI Butner); inmate Barry Johnson (FCI Edgefield); inmate Tom Krebs (FMC Lexington). See e.g. United States v. Diaz-Diaz,

(33)

2020 WL 5257872, at *3 (S.D. Cal.) (Sept. 3, 2020)
(finding "particularly persuasive that an inmate, being housed
at the same facility as Mr. Diaz-Diaz," Terminal Island,
"was hospitalized and died after he was pronounced
'recovered' by the BoP," which "makes it clear that simply
announcing that an inmate has 'recovered' does not mean that
Mr. Diaz-Diaz is completely safe from the virus," and
concluding the "high level of infection at Terminal Island,
and Mr. Diaz-Diaz's pre-existing conditions," constituted "'extra-
ordinary and compelling reasons' for his request for release").

I have not yet contracted the virus, but live in
a sea of infected, 'recovered', and unvaccinated inmates and
staff. Further the court can take note of the Marshall
Project's recent report on BoP manipulating its statistical

(34)

reporting and the Federal News Network's report that in April "BOP says it offered the COVID-19 vaccine to all of its employees, but only 49% took the agency up on its offer." Similarly, on April 13, 2021 the BOP issued a new memo emphasizing "it is imperative to continue reviewing at-risk inmates" due to continuing CORONAVIRUS risks inside BOP facilities and BOP Director Carvajal testified before the Senate Judiciary Committee in April 2021 highlighting the still ongoing COVID-19 risk inside BOP facilities. Its for those reasons that court decisions like Bozon-Pappa and Groat continue to find COVID-19 risks inside the BOP extraordinary and compelling. See also e.g. United States v. Manglona, Case No. CR 14-5393-RJB (W. Dist. Wash. Jan. 2021) (finding a vaccinated prisoner established extraordinary and compelling reasons.)

(35)

In sum, the COVID-19 pandemic inside the BOP is still killing inmates, including here at Terminal Island, and inmates like me with multiple CDC-designated category 1 and category 2 risk factors for complications and death if infected are still in extraordinary and compelling need of court intervention. My sentence was not a death sentence. Terminal Island remains a problem COVID-19 risk as evidenced by the DOJ OIG report and still pending federal court injunction cited above. Further, my medical records show my medical treatment for my heart condition has been put off as a secondary priority due to COVID-19, see e.g. ECF 140-2, pp. 4, 12-13, 16 (noting postponed cardiologist treatment due to COVID at Terminal Island) and I, along with other Terminal

36

Island inmates continue to suffer medical neglect due to COVID disarray here. See e.g. United States v. Dabalos, Case No. 2:17-cr-204-WFN-2 (ED WASH.; ECF 101)(documenting Terminal Island medical neglect during COVID resulting in blindness). See also Wilson v. Ponce, 2:20-cv-04451, ECF 74-1 (Expert Report of Michael Rowe, MD on COVID-19 at Terminal Island - Including future Risks, Aug. 24, 2020)("There is no social distancing possible in the dormitory units... there is no social distancing being enforced elsewhere... There is little access to hand sanitizer by residents... [Regarding] medical care... Charts for those with actual clinical concerns...were requested but unfortunately not reviewed... [and] [N]o facilities in the housing units for appropriate medical and nursing examinations and treatment have been established...

㊲

the institution was behind on compliance with BOP sick call referrals and chronic care appointments during the outbreak... Healthcare staff are considered to also be correctional officers and are used at times in non-healthcare positions potentially taxing healthcare resources... also creating ethical conflicts which could impede trust and the provision of care to the residents.")

My ability to provide self-care does not include being able to protect myself from infection because I cannot control the lack of COVID protocols, the lack of timely medical assistance, etc. During a pandemic, providing self-care is essential but here its impossible.

The COVID-19 situation inside the BOP and at Terminal Island specifically is an extraordinary and compelling circumstance for inmates with medical health risks like me.

(38)

## 5. § 3553(a) FACTORS:

For compassionate release motions § 3582(c)(1) plainly envisions that § 3553(a) factors can balance differently than they did originally at the time of sentencing. But, in its opposition to my motion the government merely repeats in summary fashion the balancing of those factors as if nothing has changed since my original sentencing. But, it is self-evident that every inmate requesting compassionate release is already serving a sentence that the district court believed at the time, was "sufficient but not greater than necessary." But, when Congress recently noted how seldom the BOP was allowing compassionate release the First Step Act was passed to allow inmates back into court and (39) to allow the court (at an inmate's request and explanation)

to consider changed circumstances, developments, post-conviction activity and rehabilitation, etc. If the district court's original § 3553(a) analysis was set in stone or could alone prove that a sentence reduction would be intolerable then § 3582(c)(1) would, in effect, be meaningless. But Congress clearly saw that there is good reason to believe that, in some cases, a sentence that was "sufficient but not greater than necessary" may no longer meet that criteria. As Chief Judge Roger Gregory (4th Cir.) recently explained, "[a] day in prison under the current conditions [of Covid-19] is a qualitatively different type of punishment than one day in prison used to be. In these times, drastically different. These conditions, not contemplated by the original sentencing court, undoubtedly

(40)

increase a prison sentence's punitive effect." _United States_

_v. Kibble_, 2021 US App LEXIS 9530 (4th Cir. April 1, 2021).

Here, the overriding factor under § 3553(a) that was not

present at the time of sentencing is the serious life-threatening

risk I face on a daily basis. As the BOP concedes, it _is_ a

higher risk in prison than under home confinement. In fact,

the Eighth Amendment's prohibition on cruel and unusual

punishment includes unreasonable exposure to dangerous conditions

in custody. _Helling v. McKinney_, 509 U.S. 25, 28 (1993);

_see also Wallis v. Baldwin_, 70 F.3d 1074 (9th Cir. 1995);

_Brown v. Mitchell_, 327 F. Supp. 2d 615, 650 (ED, July 28,

2004) (applying _Helling_ to 'contagious diseases caused by

overcrowding conditions").

The court can decide the compassionate release (41)

is based on the COVID circumstance and my medical condition; especially given that BOP medical staff has twice recommended me for home confinement (as cited above). See Exhibit F. The government's silence on this point is inexplicable.

Yet, in addition to the COVID-19 aspect of renewed consideration of §3553 factors there are two broad areas of post-conviction development that the court should also consider — one is personal and one is legal. Under Pepper v. United States, 562 U.S. 476, 490-93 (2011), the court can, and indeed must, consider post-offense developments as part of its renewed §3553(a) analysis.

## A. PERSONAL DEVELOPMENT AND CHARACTERISTICS.

The government emphasizes that I have a criminal

(42)

history and have significant time left on my sentence. ECF 139, pp. 16-17. But, other than commenting on a few prison discipline reports, makes no effort to substantively address several key personal development, rehabilitation, and experiences that should factor in to the court's §3553(a) analysis.

First, as documented in my prior submissions, over the last decade-plus I've completed substantial prison programming and education coursework, including drug treatment programs. See Exhibit K (Individual Needs Plan -Program Review, "Drug Education Complete 03-10-2011").

Second, since the passage of the First Step Act, courts no longer have to guess or rely on prognostic arguments from prosecutors and defendants to evaluate

43

a prisoners programing and rehabilitation progress. Developed in conjunction with the RAND corporation over several years, as required by Congress, the BOP now maintains regular assessment of an inmate's "General" and "Violent" risk-levels of recidivism upon release. The assessment tool is called the "Male Pattern Risk Scoring" assessment. The assessment is an up-to-date running evaluation of inmates; taking into account age, violent offense history, criminal history, history of violence, outside education (or prison obtained GED), drug programming, prison incident reports (with separate emphasis on serious incident reports) within the last ten years, time since incident reports, restitution payments; education programs completed and work program participation.

44

This is a formal tool of the BOP, mandated by Congress and is used to determine, among other things, the government's view of an inmate's rehabilitation progress. I've provided my most recent PATTERN assessment but rather than address it (a submitted fact record) the prosecution simply asks the court to rely on a few sparse observations by the government in generic opposition to compassionate release. But, the government's own assessment of me, in light of all these factors, is that I have progressed to being a "low" general risk and a "low" violent risk with scores of 21 and 16 respectively. See Exhibit K (Male PATTERN Risk Score, 9/23/2020). This is the only evidence before the court on the topic (except incident summaries that are factored into the PATTERN score) and it should be

45

persuasive since its the government's own assessment, and its a First Step Act tool (like my ability to ask the court for compassionate release) that is objective. Further, as I established with my medical records, if the government overlooked the need to even comment on it, this shows a lack of earnest opposition. Finally, I will point out a few salient facts. One, I have no violence in my history. Two, I've served significant time. Three, while I have a few times been caught taking things like extra apples from the kitchen, only one incident ranks as close to relevant. I'm still disputing the incident related to my supposed "verbal threat" — but as I address below, that whole incident should weigh in my favor. But, here I just want to point out: four incidents over the

(45)
46

course of more than a decade, with no violence, no drug related incidents, and a PATTERN assessment of "low" should qualify as exceptional progress and rehabilitation. I am not perfect, but I have been generally very good and the official evaluation (by government staff who interact with me, observe me, have access to my records and see my circumstance in context) shows that I present a low risk of ~~either~~ violence and ~~or~~ recidivism if released. This evaluation should not be minimized, yet the government prosecutors saw fit to ignore it in favor of pejorative conjecture.

Second, an additional development since my conviction is that the BOP has dramatically failed to protect my physical safety. In May 2019 (see e.g. ECF 140-1, pp. 63-82) I was brutally assaulted, skull crushed and left unconscious in a pool of blood.

(47)

I didn't see who struck me at least twice in the head, apparently trying to kill me. But, the court can note the proximaty in date to the 4/25/19 incident report where a prison officer claimed he heard me mutter under my breath some comment he took to be a physical threat. I admitted I made a comment to a gaurd who was refusing to treat inmates (me included) with basic dignity. But, I did not admit to making a threat (like I said I'm still working through the administrative remedy process) and because of COVID my dispute has been delayed. But, my point is I was blindly and savagly attacked immediatly after I initiated this dispute. I was hospitalized, treated and transferred to a different prison (Terminal Island). My point is not to ask this

(48)

court to affix blame on the retaliating gaurd, but it is to ask the court to consider that while in the BOP's "care" I had a life-altering never-forgettable experience where I suffered a brutal assault that most would think only should happen in the movies. But, for me it was and is real. This is one post-sentencing event that has changed me, changed the nature of my sentence and incarceration, and was absolutely not my doing, and out of my control. In the _Ferizi_ case, the Virginia federal court granted compassionate release to a defendant who had cooperated with an international terrorist organization, had been sentenced to 240 months and had only served 60 months. The defendant suffered from obesity, but other factors the court considered was "[h]e has completed educational

(49)

courses and drug treatment program" like me, "and has been rated by BOP staff as a 'low' risk for recidivism" like me, and he suffered "particularly brutal months in [a] Malaysian prison[.]" <u>Ferizi</u>, No. 1:16-cr-42(LMB) (E.D. Virginia, Dec. 3, 2020). It seems that if a court can consider brutal treatment in a foreign prison as a compassionate release factor, this court can consider the brutal treatment I've suffered in the BOP to help tip the scales in favor of my motion. Suffering a full zygomatic arch fracture and other severe blows to the head leaving me unconscious in danger of my life is certainly not something the sentencing judge contemplated as part of my punishment. Like Covid-19 risk and consequences for all BOP inmates, this unanticipated event fundamentally changed the nature of punishment

(50)

and should be considered as the court re-evaluates §3553(a)

factors as part of my compassionate release request.

## B. LEGAL DEVELOPMENTS.

Recent cases like _Aruda_, _Brooker_ and _McCoy_, all cited

earlier here, make it clear that district courts now have

broad discretion to consider any extraordinary and compelling

reason for release that a defendant might raise to justify a

sentence reduction under §3582(c)(1)(A). These have now

included as part of a court's individualized assessment, changes

in sentencing law, the mandatory nature of prior sentences and

even changing public policy. Here, this same principle has some

overlap with the court's consideration of §3553(a) factors.

These include 1) the nature and circumstances of the offense and

the history of the defendant, 2) the need for the sentence imposed,

(51)

and the need to avoid unwarranted sentence disparities. A fourth, sometimes less discussed §3553(a) factor is "the kinds of sentences available[.]" §3553(a)(4). And, the statute breaks down the "need for the sentence" factor into four subcategories including a) seriousness of the offense, respect for the law and just punishment, b) deterrence, c) recidivism, and d) providing the defendant with educational, vocational, medical or other correctional treatment. §3553(a)(2)(A)-(D). These details matter here for two developments I'm asking the court to include in its consideration.

## 1. Montana Supreme Court Ruling.

Over the last twelve years I've tried repeatedly and diligently to raise certain injustices but I have been unsuccessful. See e.g. United States v. Parke,

(52)

2020 U.S. Dist. LEXIS 16815 (Montana, Jan. 31, 2020). Candidly, my difficulty has been a combination of learning and understanding the law, and finding it very difficult to articulate my argument in court language, forms and rules. As the Supreme Court observed in <u>Kimmelman v. Morrison</u>, 477 U.S. 365, 377 (1986), "[o]f all the rights that an accused person has, the right to be represented by counsel is by far the most pervasive, for it affects his **ability to assert any other rights he may have**." I contend that no citizen knows this better than a prison inmate who, without help, is left alone in a cell with a pen and paper and little else. Even "law library" resources are often little more than a twenty-year-old manual computer index, half incomplete, and prison officials still tolerate only a few hours a month (if the inmate is lucky) and

(53)

Sometimes the only way to learn is to mail off an argument, get denied by a court decision that may clue you in on the proper form, rule, standard, etc, but only then do you find out the door you now see for the first time is closed because you only get one shot at making your argument.

Nevertheless, in 2019, the Montana Supreme court finally understood at least part of my complaint and argument and took ation on my behalf. To briefly summarize the issue:

I was arrested for this federal case, by Butte, Montana police on <u>October 23</u>, 2008. During the arrest the police tased me and dry stunned me into a coma and I was taken to St. James Community Hospital and admitted

(54)

to the ICU.   Somehow, through false court docket entries, the police and prosecutors concocted a false story that on the day of arrest (oct. 23) they had been attempting to arrest me "for an outstanding warrent for violation" of my state probation.  *See Parke*, U.S. Dist. Lexis 16815 at pp. 2-3.  In fact, my probation officer reported that I failed to inform probation of an encounter with police within 24 hours (I was in a coma in the ICU) and an arrest warrent was issued on October 27 (four days after I was in the hospital) and I was subsequently arrested and taken into custody on November 3 (or thereabout) while I was still in the hospital.

The court, my attorneys and I were all duped, and accepted the false "Offer of Proof", *see id.*, p. 3.

(55)

The false "offer of proof" and fabricated false court docket entries have frustrated my ability to bring successful Fourth Amendment challenges to the initial Oct. 23 arrest, my ability to challenge the "informed and voluntary" nature of my plea, the ability to challenge the effectiveness of both my trial and appellate counsel, and my ability to pursue Fifth Amendment Brady and prosecutorial misconduct discovery both prior to my plea, and since. But, for the first time the Montana Supreme Court noticed in 2019. I've attached the Montana Supreme court order as Exhibit L.

As relevant here the Montana Supreme Court noted: "He has tried to obtain relief concerning this error over the last decade." Ex. L, p. 2. In explaining prior unsuccessful litigation on my part the court noted, "Its apparent that neither court

(56)

recognized the true import of Parke's request for a corrected case register" (meaning docket) and agreed that I had uncovered and provided proof of the prior false enteries and insisted upon corrections. The court concluded:

> "Parke is entitled to habeas corpus relief because this writ may correct such injustice which affects an individual's incarceration or custody within a penal system. 'The writ of habeas corpus is designed to correct such flaws and to remedy 'extreme malfunctions in the state criminal justice systems.'"

Id., p. 4.  The Montana Supreme Court's characterization of the Butte police's false story, the state court's innaccurate docket and the federal prosecutor's false "offer of proof" as an "extreme malfunction" of the justice system is relevant here.  Though I haven't yet figured out how to use the Montana Supreme Court's decision (which reviews, explains, and

(57)

ruled that the initiation of what became this federal case was based on false and innaccurate warrant and arrest details) to effectively attack my conviction and sentence directly (see again _Kimmelman_ re: asserting rights) it does seem relevant here.

The court is considering §3553(a) factors in light of post-sentencing developments. The Montana Supreme Court order sheds new light on the nature and "circumstances" of the offense at issue here. It also connects additional brutal force I suffered as a result of a false police narrative. And, taking this Montana Supreme Court development and its finding of "injustice" and "extreme" malfunctioning of the courts certainly fits within the court's discretion under §3553(a)(2)(A) regarding "respect for the law[.]"

(58)

## 2. CAREER OFFENDER, §4B1.1 ENHANCEMENT

The government ignores the PATTERN assessment and the fact that its conclusion of my "low" risk of recidivism included consideration of my criminal history, and instead argues that the §4B1.1 "career offender" enhancement applied at my original sentencing necessarily requires the court to deny compassionate release. <u>See</u> ECF 139, p. 15.  The government also offers no legal authority in support of this position and further claims, "[T]he defendant's two prior controlled substance convictions from 1994 and 2003 also both still qualify as a "Controlled substance offense" under USSG §4B1.2[.]" I have to reply to this because the government is severely mistaken and the unsupported application of this "career offender"

(59)

enhancement is both an "extraordinary and compelling" reason to grant compassionate release and reason under § 3553(a) to re-evaluate the need for a sentence greater than the ten year mandatory minimum in my case and to re-evaluate "respect for the law." <u>See e.g. United States v. Bautista</u>, (No. 19-10448) (9<u>th</u> Cir., Dec. 11, 2020) (observing that unsupported §4B1.1 enhancements not only affect a defendant's substantive rights but also "seriously affect the fairness, integrity, [and] public reputation of judicial proceedings.")

Quite contrary to the governments conclusory claim that my prior 1994 (Idaho) and 2003 (Montana) "still qualify" as predicates for §4B1; <u>since my conviction and sentence</u> several Supreme Court and Ninth Circuit decisions make clear that

(60)

they never did support my "career offender" designation.

Under both <u>Mathis v. United States</u>, 136 S. Ct. 2243 (2016) and

<u>Descamps v. United States</u>, 570 U.S. 254 (2013) the Supreme

Court retroactively established that under the "categorical" approach

required by <u>Taylor v. United States</u>, 495 U.S 575 (1990) my

Montana (and likely Idaho too) state conviction in 2003 was

not a "controlled substance offense" as defined in USSG §4B1.2

and I am therefore innocent of being a career offender. Without

that enhancement my Guidelines sentence would have been

calculated with a Base Offense Level of 28 and a 2 level

adjustment for acceptance of responsibility and a 1 level adjustment

for an early plea. <u>See</u> PSR, p. 8 ¶¶ 26 and 27. My criminal

history category would not have been elevated to Category VI.

<u>See id</u>. Thus, instead of a Guidelines range of 262-327

(61)

months, my sentencing range would have been less than the statutory ten-year mandatory minimum sentence required in my case.

As a pro se defendant it is difficult and unclear to me, to know how I should assert my rights fully to challenge this "career offender" issue. But, in <u>Allen v. Ives</u>, 950 F.3d 1184 (9th Cir. 2020), the Ninth Circuit held that a cognizable claim that I am "actually innocent" of the claim that I'm a §4B1.1 "career offender", can be brought under 28 U.S.C. §2241 (pursuant to the §2255(e) "escape hatch") since my "claim under <u>Mathis</u> and <u>Descamps</u> 'did not become available until after'" my §2255 motion was denied. <u>Id</u>., at 1191. So, I'm also filing that petition here in California. See id., a 1187 ("A petition under §2241 must be filed in the district

(62)

where the petitioner is incarcerated.")

But, this leaves the question of responding to the government's argument here that my career-offender status should preclude compassionate release. As part of the matter, I've already addressed the "dangerousness"[1] point: by demonstrating the government's mistaken view of USSG §1B1.13; by citing examples of court decisions where CoVID-19-risk alone supported compassionate release with very long sentences remaining (e.g. Ferizi - only 60 months in to 290 months) and even life sentences (e.g. BOZON - Papa); and by arguing that the BOP's PATTERN score assessment rates me as a "low" risk — an objective tool, required by Congress under the First Step Act, that considers a wide range of data points and is prepared by prison staff with contextual knowledge of me, my programming, progress, etc.

(63)

But, must I await another district court's determination of my §2241 claim related to actual innocence of the §4B1.1 career-offender enhancement. It seems that a growing body of federal law on compassionate release, and multiple additional Ninth Circuit decisions over the last four years on the §4B1.1 enhancement provide support to the court's consideration of apparent injustice in an extraordinary sentence length enhancement without the court necessarily wading fully into the issue. As far as my argument here, I have attempted to provide sufficient support for compassionate release without the court having to consider this topic. However, if the court is still not convinced, it is appropriate for this court to generally consider, as part of its individualized assessment of §3553(a) factors and "extraordinary and compelling

(64)

reasons" to consider the length of my sentence in light of intervening legal developments that would likely influence my sentence if I were originally sentenced today. <u>See e.g.</u> <u>United States v. McCoy,</u> (No. 20-6821)(4th Cir., Dec. 2, 2020) ("We see no error in their reliance on the length of the defendants' sentences, and the dramatic degree to which they exceed what Congress now deems appropriate[.]"); <u>United</u> <u>States v. Maumau,</u> (No. 20-4056)(10th Cir. April, 2021) (The court's review of all circumstances included a "combination of factors...[including] the incredible" length of sentence...[when he] would not be subject to such a long term of imprisonment" today.); <u>United States v. Owens,</u> Case No. 20-2139, 2021 US App LEXIS 13656 (6th Cir. May 6, 2021). These cases deal primarily with legislative

(65)

changes that have changed the sentencing landscape for "stacked" §924(c) offences. But, the principle is that post-sentencing developments in the law would alter how a defendant would be sentenced today, making a shorter sentence more likely. This same principle is at work with "career offender" sentencing enhancement law, albiet through court decisions rather than legislative enactments.

For example, not only did *Mathis* and *Descamps* open up challenges to §4B1.1, but several Ninth Circuit cases following *Mathis* make it quite clear that the government is wrong about the career offender enhancement "still" being applicable in my case. And this is the point, this court should decline the government's argument regarding sentencing length and my career offender status based on the following overview

(66)

of career offender law as it operates today — in the Ninth Circuit.

## § 4B1.1   CAREER OFFENDER
### OVERVIEW

The government explains that the two predicate offenses "still" qualifying as "controlled substance offense[s]" under § 4B1 are my "1994" conviction (Idaho) and my "2003" conviction (Montana). ECF 139, p. 15. A facial examination of the 2003 Montana conviction illustrates the extraordinary problem. As the Montana Supreme Court explained the 2003 conviction was for "felony criminal possession of dangerous drugs with intent to distribute [.]" Exh. L., pp. 1-2.

For this prior conviction to qualify as a "controlled substance offense" under § 4B1.2 the law requires a comparison of the state statute with the federal definition of "controlled

(67)

substance offense" at § 4B1.2 using what the Supreme Court
has termed the "categorical approach" in Taylor v. United
States, 495 U.S. 575 (1990). Here, the relevant inquiry is
not what the defendant did, but what the laws / statutes
criminalize. Simply put, a court must look to see
whether the conduct made illegal by the state statute
has the "same elements" or if its broader, criminalizing
a wider range of conduct than the federal § 4B1.2 definition.
See Descamps v. United States, 133 S. Ct. 2276, 2281
(2013). Here, if the Montana statute is "broader than
the generic federal definition, then it cannot be" used
to support the § 4B1.2 career offender enhancement. United
States v. Rivera-Sanchez, 247 F.3d 905, 907-08 (9th Cir. 2001).
See also United States v. Martinez, 232 F.3d 728, 732-33

(68)

(9th Cir. 2000) (applying <u>Taylor's</u> requirements to § 4B1.1 and 4B1.2).

A plain reading of Montana Code reveals the obvious problem. Montana criminalizes "intent to distribute" and "distribution" broadly, including intent to "sell, barter, exchange, give away" including also mere "offers to sell, barter, exchange, or give away any dangerous drug as defined in [Montana Code § 50-32-101." Montana Code Ann. § 45-9-101; also § 45-9-102. On the other hand the generic federal definition only prohibits "the manufacture, import, export, distribution or dispensing of a controlled substance" and the "intent" to do the same. USSG § 4B1.2 (b). In other words, while both state and federal laws at issue use the term "distribute" and/or "distribution" in their proscribed conduct, Montana law criminalizes mere offers,

⑥⑨

as well as non-commercial transactions ("give away") and
solicitation ("offers") to engage in non-commercial transactions,
while the Ninth Circuit (and other federal appellate courts)
has long explained that such differences make the state
statute "overbroad" and not a categorical match. In
addition the Montana statute references a seperate statute
for a list of what constitutes "dangerous drugs" under Montana's
law, and this list too is broader than the federal law, thus
seperately prohibiting a categorical match. _See United States_
_v. Bautista_, (No. 19-10448) (9ᵗʰCir. Nov. 23, 2020) (finding
"plain error" where the defendant's Arizona conviction was
"overbroad" and "not a categorical match" because the state
list of prohibited substances included "hemp" but the federal
law does not, therefore the §481.2(b) enhancement was

70

impermissible.); United States v. Rivera-Sanchez, 247 F.3d 905 (9th Cir. 2001)(making distinction between "offers" and "attempts" and solicitation prohibited by state law, when the relevant federal definition "does not mention solicitation" thus finding no categorical match); United States v. Casarez-Bravo, 181 F.3d 1074 (9th Cir. 1999)(finding improper §4B1.1 enhancement because state law criminalized non-commercial "personal use" which is not covered by §4B1.1). See also United States v. Havis, 927 F.3d 382 (en banc), rehearing denied, 929 F.3d 317(6th Cir. 2019) (holding that attempt crimes and "offers" to sell "do not qualify for the §4B1.1 career-offender enhancement); United States v. Cavazos, 950 F.3d 329 (6th Cir. 2020)(same); United States v. Savage, 542 F.3d 959, 965-66 (2d Cir. 2008) (state law criminalizing "mere offer[s]" criminalize "more

(71)

conduct than falls within the federal definition of a controlled substance offense").

In sum, the government was incorrect when it relied on the career offender § 4B1.1 enhancement at my sentencing and when it opposed my pending motion for compassionate release based on the conclusory allegation that my prior convictions "still" qualified as § 4B1.1 predicate offenses. Further, the court need not wade all the way into this issue to take notice of the following: even if the government could succeed in arguing that the "overbroad" Montana statute was "divisible" in each instance of where it is overbroad — see e.g. United States v. Corona-Sanchez, 291 F. 3d 1201, 1203 (9th Cir. 2002)(en banc)(describing a "narrow range of cases" where a "modified" categorical approach is allowed) — it would

72

still fail to establish the state law conviction as a predicate § 481.1 predicate because the record here shows that the sentencing court relied merely on the PSR's assertions rather than judicially recognized documents required to be submitted by prosecutors prior to sentencing. See Casarez-Bravo, 181 F. 3d at 1078 ("We vacate the sentence and remand for resentencing with instructions that Casarez-Bravo not be sentenced as a career criminal" because the statute of the prior conviction was overbroad and no "proper judicially noticeable facts" established a predicate offense, instead "the only document in the record" was the PSR.)

Here is the point. If this court denies compassionate release, the California court will be where this issue is fully litigated. But, in direct rebuttal the the government's reliance on

(73)

this career offender argument, this court need do no more
than a basic review of the sentencing record here, no
more intensive than the Ninth Circuit does following reception
of an _Anders_ brief (Anders v. California, 386 U.S. 738,
(1967) because the law is sufficiently established that
the possibility of plain error is readily discernable without
litigation. _See e.g. United States v. Nevels_, 2019 U.S. App.
Lexis 24822 (9th Cir. Aug. 20, 2019). Once that observation
is confirmed the "fairness, integrity" and "public reputation of
judicial proceedings" as well as the possible violation of my "substantial
rights" are at issue - directly relevant to §3553(a). And,
should the court probe deeper, since _Mathis_, it has become clear
that the Montana statute at issue is not "divisible." See
_United States v. Graves_, 925 F.3d 1036 (9th Cir. 2019)

(74)

("If a statute that sweeps more broadly than the federal offense "sets out a single (or 'indivisible') set of elements to define a single crime" no conviction under that law can count as the qualifying predicate offense. Mathis v. United States, 136 S.Ct. 2243, 2248-49 (2016)... A statute is... indivisible if it... merely 'enumerates various factual means of committing a single element.'"); See also United States v. Ocampo-Estrada, 873 F.3d 661 (9th Cir. 2017) ("If a predicate statute is divisible - i.e. it lists alternative elemental versions of the offense within the same statute, ... then the modified categorical approach is used[.]") Here the Montana statute lists a single set of indivisible elements including offers and giving away dangerous substances, and does not list alternative elements for the substances in the same statute, both fatal to establishing grounds to employ the modified

(75)

categorical approach.

## <u>CONCLUSION</u>

I'm a 53-year-old citizen who has served more than 12 years in federal prison on my current 262 month sentence for a non-violent drug offense. I have no history of violence and during my twelve years in prison I've made substantial efforts to better myself, stayed trouble free except for four non-violent incidents (one of which is still in dispute), completed drug education, other programs, work programs and I'm now rated a "low" risk inmate with a "low" risk of recidivism by the BoP's ~~pattern~~ PATTERN assessment tool.

When I was sentenced I already suffered from serious health conditions "heart value disease, congenital

76

heart failure, aortic insufficiency, chronic congestive heart failure and leukocytosis" PSR; p. 14, ¶ 57. I now suffer from hypertension, GERD, gout, glaucoma with a history of falling (see ECF 140-1, p. 4) and several additional ailments. During my time in prison I have also been brutally assaulted, had my skull crushed (my zygomatic arch was fractured), was knocked unconscious and left laying in a pool of my own blood. After I was somewhat recovered I was transferred to FCI Terminal Island in San Pedro, California. I have gained weight am am now also morbidly obese.

Not long after arriving at Terminal Island, the global CoviD-19 pandemic began ravaging the United

77

States, and especially the BOP.

Due to widely documented mismanagement and being overwhelmed by COVID, Terminal Island suffered one of the worst prison outbreaks of COVID-19 in the country with more than 70% of the inmate population testing positive for COVID. Ten of my fellow inmates here died due to COVID in the early stages, and inmates and staff continued to test positive every month between March 2020 and May 2021, even though we were quarantined repeatedly; the prison reduced its population to less than 800 inmates (more than 25% reduction).

COVID continues to spread here, Terminal Island remains under a federal court's injunction based on the Eighth Amendment, and is still experiencing horrible consequences with another

78

inmate dying of COVID complications just 10 days ago.

During this time, as cited by the DOJ OIG report and Dr. Rowe's report not only has COVID-risk been exceptionally high here (even higher due to neglect, mismanagement, etc.) but other medical services have also suffered. As I documented here my own cardiologist treatments have been neglected by the BOP due to COVID related complications.

I've twice been recommended for Home Confinement by BOP Health Services, who have twice documented and verified my CDC-based COVID risk of complications (severe) and possible death if I become infected. BOP Health Services have confirmed (as I explained and cited herein) that under all the circumstances they've evaluated, including my health, ⑲

inmate eligibility and institutional circumstances – the best way to address my circumstance is release to home confinement. These recommendations were made in two separate reports back in October and November 2020. But, like Terminal Island has established since March 2020 – this place is slow and neglectful without reason, explanation or justification. These recommendations might as well have been rolled into a bottle and tossed into the Long Beach harbor just outside our prison walls because no matter how many inquiries I make, no answer or explanation is given. I just learned, for example, that my Case Manager Mr. Sproul has left (Terminal Island or the BOP – I don't know). This means no one is looking out for me – even ostensibly until a new case manager is found. This will

(80)

be the third case manager for me, just since COVID.

The point is, I've brought this compassionate release request because the COVID-19 pandemic, how its effected Terminal Island and my very serious health conditions and COVID-19 risks are extraordinary reasons for the court to reduce my sentence to time served, or at least to convert my remaining time to supervised release with home detention as a condition. When re-weighing the required § 3553(a) factors in this context the substantial time I've served, the improvement I've made post-conviction, and my low risk of recidivism satisfy the "not greater than necessary" standard when considering deterrence, justice, respect for the law, sentencing uniformity, etc.

Should the court need additional support, the brutal

(81)

violence I've suffered while incarcerated and the deterioration of my health over the last 12 years also give new context to the weighing of §3553(a) purposes.

Finally, should the court need additional reasons; the government's lack of earnest opposition, lack of candor, neglect of material issues and conclusory dismissal of my verified COVID risk, the BoP's assessment of my low risk of recidivism and mistaken reliance on USSG §1B1.13 - these all point to the heavier side of justice weighing in favor of granting compassionate release. And as a post-script, the government's position is even weaker if the court considers, as it should, the success I finally had in obtaining the Montana Supreme Court's order verifying that the whole case against me began with a false story by Butte police

(82)

and a false docket report in the initial state case claiming that my initial arrest was in furtherance of an arrest warrant that was never issued until after police ambushed me (without a warrant), tasered me, left me in a coma and transported me to the local hospital. Whatever else comes of the light now shed on that incident (and the false and misleading "offer of proof" made by federal prosecutors apparently relying on the Butte police's false and misleading story — which then frustrated and tainted my rights going forward — this court, as part of its §3553(a) weighing of factors can (and should) consider the Supreme Court of Montana's characterization of what happened as an "extreme" "malfunction" of the justice system as mitigating much of the context of the facts, history

(83)

of my case, charges and conviction. This is material because of
the prosecutorial misconduct and frankly the additional brutality
I suffered at the inception of this case — when there
in fact was no violation warrent outstanding when police
stayed, targeted, tased and arrested me — into a coma.

On top of all this I spent considerable time also
outlining addition post-conviction legal development related
to my sentence being derived from a career-criminal
enhancement that was put in place, ruled on, and used to
enhance my possible sentence guideline range from less than
10 years — to more than 20 years without even an inch
of judicially noticable evidence required of prosecutors — if
the Montana prior conviction even could qualify through the
use of the "modified categorical" approach after Mathis.

(84)

After all this, what I'm asking for is a chance to not die in prison, a chance to live outside with family and friends. I believe I've satisfied the "extraordinary and compelling" standard as implemented by this court in other cases, and shown that under §3553(a) the post-sentence realities here now satisfy the required factors based on the time I've already served — and what that time has meant.

Dated: MAY 19, 2021

Sincerely,

x_____

Charles B. Parke (#10211-046)
FCI Terminal Island
San Pedro, CA 90733



# VERIFICATION

I declare, under penalty of perjury, and the laws
of the state of California, that the factual
statements made in the forgoing REPLY memorandum
are true and correct based on my knowledge,
belief, personal experience and understanding.

5/19/21  x _Charles B. Parke_
Charles B. Parke
San Pedro, CA

# DELIVERY NOTICE

I deposited this Reply in the K-unit outgoing mailbox
at Terminal Island, addressed to the clerk of the district
court, with first-class postage prepaid and affixed for delivery
by the United States Postal Mail on: _May 20, 2021_

x. _Charles B. Parke_
Charles B. Parke
San Pedro, CA (Terminal Island)

# REQUEST TO WAIVE SERVICE

Due to CoViD-19 lockdown conditions, Terminal Island commissary
has not sold paper for the last 6 weeks (white, lined) (86)
and I have run out. I do not have funds to make a photocopy
(.117 per page x 86 = $10 plus postage) and I understand the government
can obtain a free copy via ECF.    x _Charles B. Parke_